IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:17-CV-617-D

| | | |
|---|---|---|
| CHRISTOPHER SWINDELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| CACI NSS, INC., and | ) | |
| QUICK SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

On January 29, 2018, Christopher Swindell ("Swindell") filed an amended complaint against CACI NSS, Inc. ("CACI") and Quick Services, LLC ("QSL"; collectively, with CACI, "defendants") [D.E. 13]. Swindell alleges four causes of action: (1) racially hostile work environment under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq.; (2) retaliation under Title VII; (3) race discrimination under 42 U.S.C. § 1981; and (4) wrongful discharge in violation of North Carolina public policy. See id. On October 18, 2019, CACI moved for summary judgment [D.E. 61] and filed a memorandum and statement of material facts in support [D.E. 62, 63]. On October 21, 2019, QSL moved for summary judgment [D.E. 68] and filed a memorandum and statement of material facts in support [D.E. 69, 70]. On December 4, 2019, Swindell responded in opposition [D.E. 74, 75, 76, 77, 81]. On December 16, 2019, Swindell moved to amend his memorandum in opposition [D.E. 86]. On January 8, 2020, CACI replied [D.E. 87] and QSL replied [D.E. 90]. As explained below, the court grants Swindell's motion to amend his memorandum in opposition, and grants defendants' motions for summary judgment.

I.

In November 2009, the United States Department of Defense selected L-3 National Security

Solutions ("L-3")[1] as the prime contractor on a contract, "Dagger II," to provide "Imagery Analysis Services." [D.E. 76] ¶¶ 1–2. QSL was one of multiple subcontractors on the Dagger II contract. Under the contract, L-3 provided 24-hour imagery intelligence to the United States Special Operations Command ("SOCOM"). Id. at ¶¶ 5–6. SOCOM oversees the special operations commands of the United States military's individual branches, and is part of the United States Department of Defense. SOCOM conducts "covert and clandestine missions, such as direct action, special reconnaissance, counter-terrorism, foreign internal defense, unconventional warfare, and counter-narcotics operations." Id. at ¶ 7. All services associated with Dagger II were performed at Fort Bragg, a US Army installation. The United States government controlled access to the JSOC compound on Fort Bragg. See id. at ¶ 8.

Individuals working on Dagger II were assigned to the Geospatial Intelligence Exploitation Troop ("GET"). Id. at ¶ 11. Geospatial intelligence involves gathering information concerning the activities of target individuals that is "derived from the exploitation and analysis of imagery and geospatial information that describes, assesses, and visually depicts physical features and geographically referenced activities on the Earth." Id. Three individuals lead the GET: a military commander, a senior civilian deputy, and a senior enlisted advisor. See id. at ¶ 12.

Individuals working on Dagger II had to have a Top Secret with Sensitive Compartmented Information security clearance. Id. at ¶ 14. Additionally, the United States established training standards that applicants were required to meet to work on Dagger II, and L-3 and QSL conducted a "skill verification" process to ensure the applicants met those standards. See id. at ¶ 13; Moore

---

[1] In 2016, after all events relevant to this action. CACI's parent company purchased L-3's stock. See [D.E. 76] ¶ 3. Because both parties refer to L-3 and not CACI in the motions, the court uses L-3.

Dep. [D.E. 80-21] 5;[2] Swindell Decl. [D.E. 80-1] ¶ 12.

Full motion video analysts ("FMVs") are referred to as geospatial intelligence analysts in the Dagger II contract. [D.E. 76] ¶ 19. As part of Dagger II, government civilians, military personnel, and contact personnel work on various teams. See id. ¶ 34.

When working missions, personnel work in teams of two – a screener and an imagery analyst ("IA"). The screener watches the live video feed, makes calls as specified by the government, and touch types the information into a database. Id. ¶ 40. The information recorded by the screener appears in a chat room. Id. The video feed and the chat room can be viewed live at JSOC or remotely, by military members and government personnel with requisite clearances, including the President of the United States. Id.

The IA uses the information entered by the screeners to create PowerPoint products that document the mission. The government also uses the information for future missions. See id. at ¶ 41. For example, the product may be used to identify a target for a military strike. Id. Military and other personnel also often rely on the IA's and FMV's work during live missions. Failure to perform the job competently can jeopardize special operations missions and potentially cause injuries or deaths to civilians and military personnel. See Swindell Dep. [D.E. 63-2] 113; Ulloa Dep. [D.E. 63-2] 172–77.

Before releasing work product to the government, a senior analyst performs a quality control ("QC") review of it. [D.E. 76] ¶ 43. The QC person can review the recorded video feed and compare it to the information typed into a secret database by the screener to ensure accuracy. See id. Every entry in the database can be traced to the person who made it. Id. at ¶ 44. Each entry reflects a user identification and an associated date time stamp. Id. The original date and any changes made to it are preserved—each reflecting a unique user identification and date time stamp.

---

[2] Record citations are to the CM-ECF page and not to the deposition transcript page.

See id. Personnel are prohibited from using another individual's user identification. Id. at ¶ 45.

FMVs on the Dagger II contract worked twelve hour shifts, on average—alternating four day and three day workweeks. Id. at ¶ 47. Shifts which began in the evening would span two calendar days (e.g., 6:00 p.m. to 6:00 a.m. ). See id.

Given the mission-critical nature of the Dagger II contract, if the government lost faith in a team or team member, the government had the authority to remove contractors, civilians, or military personnel from the mission floor. See Byers Dep. [D.E. 63-2] 13–14; Joel Harrison Dep. [D.E. 63-2] 24–29. On the other hand, removing team members results in significant costs; therefore, the government does not remove personnel "willy-nilly." Sargent Dep. [D.E. 63-2] 70.

On March 3, 2015, Swindell was hired as an FMV on Dagger II. See Swindell Dep. [D.E. 63-2] 108–09. QSL paid Swindell and provided Swindell's employment benefits. See [D.E. 76] ¶ 22; Swindell Dep. [D.E. 63-2] 109, 154. L-3 was responsible for supervising Swindell (and all other QSL analysts). See [D.E. 77] ¶¶ 12–13; Sawyer Dep. [D.E. 80-19] 8–9.

Before being hired as an FMV on Dagger II, Swindell served in the United States Air Force from 2009 until February 25, 2015. See [D.E. 76] ¶ 17. While in the Air Force, Swindell gained some experience as a geospatial analyst. See id. at ¶ 18. FMV analysts are considered geospatial analysts under Dagger II, and the pool of applicants qualified for this work is limited. See id. at ¶¶ 19–20.

On March 9, 2015, Swindell began a two-week FMV analyst training course for Dagger II. At the end of training, the evaluators provided a detailed critique of Swindell's performance and recommended that Swindell repeat the training session, and stated that he "[w]ould not make a good addition to the GET at this time." [D.E. 63-2] 5. Swindell states that he was recycled because he missed class with pink eye and that two of the three other individuals in Swindell's training were

4

recycled. See Swindell Dep. [D.E. 80-26] 18; Swindell Decl. [D.E. 80-1] ¶ 12.[3]

It is uncommon for individuals to go through FMV analyst training more than once. See Sargent Dep. [D.E. 63-2] 71; Ulloa Dep. [D.E. 80-23] 5–6. After recycling through FMV analyst training, the evaluators again provided a detailed critique of Swindell's performance, but "recommended with reservations" that Swindell work on the GET. See [D.E. 63-2] 7. The evaluators noted that Swindell "will need to be monitored closely on his processes and production." Id.

On April 9, 2015, Swindell was assigned to the "Red Team" on Dagger II. See Swindell Dep. [D.E. 63-2] 114–15. There were five teams working on Dagger II to provide imagery analysis services. The teams rotated to provide these services 24 hours per day, 7 days per week. See Byers Decl. [D.E. 70-1] 3. FMVs generally worked twelve-hour shifts for three or four days per week. See id. Every team had a Government Team Chief who was a government civilian, a Non-Commissioned Officer in Charge who was a military member, and a Team Lead from L-3. See id. Additionally, other government civilians, military members, and contract personnel were assigned to each team. See id. The Government Team Chief had responsibility for government civilians and military members, and neither L-3 nor QSL had authority over either. See id. Matt Craig ("Craig") was the Government Team Chief for Red Team. See Malave Dep. [D.E. 70-1] 48. Craig reported to Joel Harrison, who was the senior civilian government employee for Dagger II. Id.

When Swindell started with the Red Team, William Malave ("Malave") was the L-3 Team Lead. See Malave Dep. [D.E. 63-2] 47, 55–56. The Red Team had approximately 35 people. See Swindell Dep. [D.E. 80-26] 13–16. Those people included, inter alia, Marion Spencer ("Spencer")

---

[3] Each party submitted declarations of witnesses who were deposed. The court disregards any portion of a declaration that contradicts the witness's deposition testimony. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999); In re Family Dollar FLSA Litig., 637 F.3d 508, 512 (4th Cir. 2011); Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984).

from QSL, Rob Harrison from QSL, Kevin Brower ("Brower") from subcontractor GeoOwl, Justin Shaw ("Shaw") from subcontractor Xcellent Technologies, Inc., Felix Ulloa ("Ulloa") from L-3, and Megan Welch ("Welch") from subcontractor Riverside Research. See Byers Decl. [D.E. 70-1] ¶ 29. Throughout Swindell's time working on Dagger II, Swindell was assigned a team trainer. See Ulloa Dep. [D.E. 63-2] 170. Additionally, Ulloa reviewed Swindell's work product as part of his responsibilities as an L-3 senior analyst. See id. at 164, 170–71. Ulloa's general responsibilities included ensuring that every work product was accurate and timely. See id. at 160–61. Ulloa testified that "[i]f you have a team trainer assigned to you, you're not meeting the standard." See id. at 190.

On May 20, 2015, Swindell reported on a government Command Climate Survey that he had heard inappropriate comments at work. See Swindell Dep. [D.E. 63-2] at 125–28. Swindell received no response from the government. Id.; Malave Dep. [D.E. 63-2] 49.

On May 30, 2015, for the 6:00 p.m. to 6:00 a.m. shift, Swindell was assigned to work with Spencer for training to improve Swindell's processes. See Swindell Dep. [D.E. 63-2] 142–43. Swindell received verbal counseling concerning his performance. See [D.E. 63-2] 8; Malave Dep. [D.E. 63-2] 55; Swindell Dep. [D.E. 63-2] 116; Ulloa Dep. [D.E. 80-23] 11–12.

On May 30, 2015, during the evening portion of his 6:00 p.m. to 6:00 a.m. shift, Swindell told Malave (the L-3 Team Lead) about racial comments that Swindell overheard or that were directed to him while working on Dagger II and his anonymous report to the Command Climate Survey. See Malave Dep. [D.E. 63-2] 49, 51–52; [D.E. 76] ¶¶ 57–58. Specifically, Swindell told Malave that QSL employee Rob Harrison said that Swindell made him "think of EBT," an acronym that Swindell believed stood for Electronic Benefits Transfer. See Malave Dep. [D.E. 63-2] 51. Swindell also described a conversation with a military member wherein the military member and Swindell were discussing crime. The military member asked Swindell whether he would "feel safer in Southeast D.C. or Yemen." Swindell Dep. [D.E. 63-2] 147. Swindell responded Southeast D.C.

6

even though the crime was terrible in both D.C. and Yemen. Id. The government employee then said that Swindell would not "fit in Yemen" because he was "a bigger black guy and Africans are skinny." Id.

On May 31, 2015, Malave notified Government Team Chief Matt Craig about Swindell's concerns, but did not initially reveal Swindell's name because Swindell asked to remain anonymous. Malave Dep. [D.E. 63-2] 53. Craig told Malave that he wanted to speak with the person who had the concerns. Id. After Malave confirmed with Swindell that Malave could reveal Swindell's identity to Craig, Craig and Malave spoke with Swindell about Swindell's concerns. Id.

At 5:15 a.m. on May 31, 2015, Matt Craig emailed Joel Harrison, Jim Moore, Kendall Smalls, and other government and military personnel to report Swindell's perception of racism in the workplace. See [D.E. 77] ¶ 52. Malave notified L-3 Program Manager Jim Moore. See Moore Dep. [D.E. 80-21] 15. Malave then verbally counseled Rob Harrison about inappropriate workplace conversations. See Malave Dep. [D.E. 80-17] 15–16; [D.E. 78-1] 4–5.

At the end of the 6:00 a.m. morning shift on May 31, 2015, Craig and Malave held a team meeting with the Red Team. Craig told the entire team that making racial comments or creating a hostile work environment was against policy and would not be tolerated. See Malave Dep. [D.E. 63-2] 53–54. After the government personnel left the meeting, Malave spoke with the contractor personnel and reiterated that racial comments or creating a hostile work environment were not acceptable. See id.

After the meeting on May 31, 2015, Rob Harrison and Hovland spoke with Swindell individually. See Swindell Dep. [D.E. 80-26] 22–24. According to Swindell, Rob Harrison and Hovland asked how Swindell was doing, and told him that if he had any issues with racial comments in the future, he should report them to them. See id. at 23. Swindell perceived this conversation as a threat. See id.

On June 5, 2015, Malave sent an email to Red Team members emphasizing the need for

sensitivity to racial issues. See [D.E. 76] ¶ 61. On July 10, 2015, Steve Loori ("Loori") replaced Malave as the L-3 Red Team Lead, and Malave transferred to L-3 Green Team as a senior analyst. See Malave Dep. [D.E. 70-1] 57–58; Loori Dep. [D.E. 63-2] 32–33. Loori had recently returned from a four-month deployment to Afghanistan, and L-3 Program Manager Jim Moore had told Loori in approximately late April or early May 2015 that he would be the Red Team Lead upon his return from deployment. See Loori Dep. [D.E. 80-18] 5.

On July 12, 2015, Swindell was removed from a "high visibility" live mission "d[ue] to missed callouts on a high priority target." Loori Dep. Ex. 28 [D.E. 63-2] 205–06; Ulloa Dep. [D.E. 80-23] 17–20; Swindell Dep. [D.E. 63-2] 149. Government Team Chief Matt Craig directed that Swindell needed to be removed from the mission, and Ulloa (a senior analyst with L-3) approached Swindell and told him to step away from his station. See Loori Dep. [D.E. 63-2] 36–38; Ulloa Dep. [D.E. 80-23] 17–20. After Swindell was removed, Loori and Ulloa prepared an "Employee Counseling Report/Performance Improvement Plan" ("PIP"). See Loori Dep. [D.E. 63-2] 36; Ulloa Dep. [D.E. 80-23] 17–20. On the same date, Loori and Ulloa discussed the PIP with Swindell. See Ulloa Dep. [D.E. 80-23] 20–22. The PIP noted that the "first course of action" was "remedial training" for Swindell, followed by re-evaluation and "an updated counseling noting [Swindell's] progress on or about August 10[, 2015]." Loori Dep. Ex. [D.E. 63-2] 205–06; see Pl.'s Ex. 10 [D.E. 80-10] 2. Loori and Ulloa then assigned another trainer to Swindell to get "another perspective of what he's doing wrong" in order to "help him." Ulloa Dep. [D.E. 80-23] 20.

At the PIP meeting on July 12, 2015, Swindell was upset and told Loori and Ulloa that he thought he was being "targeted because of his race." Loori Dep. [D.E. 63-2] 41; Ulloa Dep. [D.E. 63-2] 184–87. After the PIP meeting, Loori reported Swindell's statements concerning being targeted because of his race to L-3's Deputy Program Manager, Scott Byers ("Byers"). See Loori Dep. [D.E. 63-2] 42; Byers Dep. [D.E. 80-20] 12, 14.

After being removed from the line and counseled at the PIP meeting on July 12, 2015,

8

Swindell called QSL Director of Operations Jason Sawyer ("Sawyer") on July 12, 2015. See Swindell Dep. [D.E. 63-2] 150. Swindell told Sawyer his belief that his complaints about racial comments led to retaliation. See Sawyer Dep. [D.E. 80-19] 9; Swindell Dep. [D.E. 63-2] 150–51. During his conversation with Swindell on July 12, 2015, Sawyer told Swindell that he would look into the complaints and granted Swindell's request for two days of paid time off. See Sawyer Dep. [D.E. 80-19] 9; Swindell Dep. [D.E. 63-2] 155.

On July 12 or 13, 2015, after Sawyer spoke with Swindell, Sawyer contacted the QSL CEO, the QSL Human Resources Director, and QSL Human Resources Representative Pixley about Swindell's complaints. See Sawyer Dep. [D.E. 80-19] 9–11. Sawyer also counseled Rob Harrison about inappropriate comments. See Sawyer Dep. [D.E. 80-19] 11–13, 15 ; [D.E. 80-16] 4–5; Moore Dep. [D.E. 80-21] 40. Sawyer also spoke with L-3 Program Manager Jim Moore on the same date about Swindell's complaints. See Moore Dep. [D.E. 80-21] 42. Moore also promptly counseled Rob Harrison about his "unprofessional conduct" in the workplace. See id. at 43. QSL also issued a directive for all QSL employees to take follow-up EO training on the QSL anti-harassment policy and to immediately report EO issues. See Sawyer Dep. [D.E. 80-19] 12. After the July 12, 2015 call with Jason Sawyer, Swindell experienced no further discriminatory racial comments or harassment. See Swindell Dep. [D.E. 70-1] 153, 165–66.

On July 21, 2015, Swindell returned to work. On July 22, 2015, Sawyer and a QSL Human Resources Representative Pixley invited Swindell to a meeting to discuss Swindell's complaints about the work environment. See Swindell Dep. [D.E. 63-2] 154–57; Sawyer Dep. [D.E. 80-19] 14. The meeting was scheduled for July 23, 2015. Swindell Dep. [D.E. 63-2] 154–57. Initially, Swindell accepted the meeting, but Swindell canceled the meeting on July 22, 2015. Swindell Dep. [D.E. 80-26] 66–67.

After Swindell returned to work on July 21, 2015, Shaw of Xcellent Technologies observed Swindell, kept a running log of Swindell's performance that appeared on screens on the mission

9

floor, and logged observations of Swindell's performance on three days: July 21, 27, and 28, 2015. See Schagane Dep. [D.E. 63-2] 84–86, 90–92, 96–98; Schagane Dep. Ex. [D.E. 64] 2–3. On July 21, 2015, Shaw noted that Swindell made off-target calls, lacked attention to detail, and submitted an "overview" report with several issues. See Schagane Dep. Ex. [D.E. 64] 2.

On July 28, 2015, at 12:54 P.M., Joel Harrison, the senior civilian deputy commander, emailed Walter Sargent, the Contracting Officer Representative, to recommend terminating Swindell's employment on Dagger II. See Harrison Dep. [D.E. 63-2] 28–29; Byers Dep. [D.E. 80-20] 23–25; Sargent Dep. [D.E. 63-2] 74. Joel Harrison's email stated:

> I recommend that Chris Swindell be removed from the DAGGER II task immediately. Chris is coming up on his fifth month on task however has not progressed from the basic issues observed during his initial training. Chris was put through initial training twice and continues to require daily hands-on oversight/guidance. He has not progressed with his peers and has become both a detriment and risk to our operations.

[D.E. 63-2] 9; [D.E. 64] 6–10; see Harrison Dep. [D.E. 80-22] 8–12, 19–22. Joel Harrison based his recommendation on discussions with government personnel (including Team Chief Matt Craig who had observed Swindell's deficient performance on July 12, 2015) and contractor personnel (who also had observed Swindell's deficient performance) and documents that L-3 provided. See Harrison Dep. [D.E. 80-22] 8–12, 19–22; see Loori Dep. [D.E. 70-1] 37–39. The fact the L-3's PIP for Swindell stated that Swindell would have until August 10, 2015, to improve his performance was "not relevant" to Harrison's recommendation. Harrison Dep. [D.E. 80-22] 8–12, 19–21. Joel Harrison "could not afford the risk to my mission to keep somebody that can't do the job." Id. When Joel Harrison wrote his email, he expected Swindell to be removed from Dagger II immediately. See id. at 22.

On July 28, 2015, at 2:05 P.M., Contracting Officer Representative Sargent emailed Scott Byers, L-3's Deputy Program Manager, copying Joel Harrison and others on the email. The email stated: "Please remove Chris Swindell from the Dagger II contract. He is not performing to the

10

required quality. Remove him at the next natural transition point." Swindell Dep. [D.E. 63-2] 9. Based on the information Sargent had, Sargent believed Swindell was "not doing the job," and the United States was "paying for something that [it was] not getting." Sargent Dep. [D.E. 63-2] 72. In Sargent's opinion, Swindell was not at a level of performance to sit on the mission floor. See Sargent Dep. [D.E. 70-1] 75.

After receiving Sargent's email, Byers of L-3 talked to Sawyer of QSL about meeting with Swindell to remove him from Dagger II. See Byers Dep. [D.E. 80-20] 25–26; Moore Dep. [D.E. 80-21] 35. L-3 released Swindell back to QSL. See Byers Dep. [D.E. 80-20] 25, 30. QSL did not have another position within QSL to place Swindell and could not defy the government's directive to remove Swindell from Dagger II. See Sawyer Dep. [D.E. 80-19] 17; Byers Dep. [D.E. 80–20] 6. The government completely controlled access to the JSOC compound on Fort Bragg. See [D.E. 76] ¶ 8. On July 28, 2015, Byers and Sawyer took Swindell off the floor, informed Swindell that his employment was terminated for performance reasons, and escorted him out of the building. See Swindell Dep. [D.E. 63-2] 152–53.

## II.

In order to be liable under Title VII, an entity must be an "employer" of plaintiff. See 42 U.S.C. § 2000e(b) (defining "employer" as a "person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person."); Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 408 (4th Cir. 2015). In Butler, the Fourth Circuit adopted the "joint employment" doctrine. Id. at 409. Under that doctrine, more than one entity may be an "employer" under Title VII. See id. at 408. To determine whether plaintiff is employed by two or more entities, a court uses a ten-factor "hybrid test" that combines the common-law element of control and the following nine factors:

(1) authority to hire and fire the individual;

11

(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used and the place of work;

(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

(5) the length of time during which the individual has worked for the putative employer;

(6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties;

(8) whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter into an employment relationship.

Id. at 414. Although no one factor is dispositive, the first three are the most salient and the last factor is "of minimal consequence." Id. at 414–15 & n.12. Additionally, the "common-law element of control remains the 'principal guidepost' in the analysis." Id. at 414; see Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440, 448 (2003); Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323–24 (1992); see also Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 259–61 (4th Cir. 1997) .

Although defendants do not dispute QSL's and L-3's status as joint employers for purposes of their motions for summary judgment, the parties dispute the scope of joint-employer liability. QSL and L-3 argue that each company is responsible only for actions of their respective employees. See [D.E. 62] 9–10; [D.E. 69] 10–11. Specifically, QSL and L-3 argue that although the Fourth Circuit in Butler did not explicitly limit a joint employer's liability to its own actions, the court implicitly adopted such a limit when it cited out-of-circuit precedent that refused to "impute liability from one joint employer to another" unless one employer participated in or knew of and did nothing to prevent the other employer's discriminatory actions. Velasquez v. Sonoco Display & Packaging, LLC, No. 1:17CV865, 2018 WL 1773128, at *3 (M.D.N.C. Apr. 11, 2018) (unpublished), report and recommendation adopted, 2018 WL 2016506 (M.D.N.C. Apr. 30, 2018) (unpublished); see [D.E. 62] 10; [D.E. 69] 11–12.

12

In opposition, Swindell argues that a joint employer may be liable for a co-employer's actions if that employer "knew or should have known" about the discriminatory behavior and did nothing to prevent it. See [D.E. 86-1] 13–14; see Burton v. Freescale Seminconductor, Inc., 798 F.3d 222, 228 (5th Cir. 2015).[4] In Burton, the Fifth Circuit joined the First, Seventh, and Eleventh Circuits to hold that establishing a "'joint employer' relationship does not, create liability in the co-employer for actions taken by the other employer." Id. at 228 (quotation omitted). A joint employer may be liable, however, if "it participates in the discrimination, or if it knows or should have known of the [co-employer's] discrimination but fails to take corrective measures within its control." Id. at 229. Swindell asserts that "both L-3 and QSL (and the government) . . . actually knew of [his] complaints of a hostile work environment and retaliation," and that L-3 and QSL "fail[ed] to take corrective actions" within their control before terminating Swindell's employment on July 28, 2015. [D.E. 86-1] 15.

Defendants recognize the same core agency principle from Burton: L-3 can be liable for QSL's discriminatory action, and vice versa, only if L-3 (or QSL) had actual or constructive knowledge of the discriminatory action and failed to take corrective measures within its control. Compare [D.E. 86-1] 13–14 with [D.E. 62] 10 and [D.E. 69] 11. Although the Fourth Circuit has not directly addressed this issue, district courts in the Fourth Circuit that have reached the issue apply the Burton standard. See Burton, 798 F.3d at 228 (collecting cases); Crump v. U.S. Dep't of Navy, No. 2:13-cv-707, 2016 WL 901262, at *1–2 (E.D. Va. Mar. 3, 2016) (unpublished); Williams v. Grimes Aerospace Co., 988 F. Supp. 925, 937–38 (D.S.C. 1997). Additionally, the Burton standard comports with EEOC guidance. See Velasquez, 2018 WL 1773128, at *3–4. Moreover, the Burton standard comports with the fourth element of a Title VII hostile work environment claim concerning

_____

[4] Swindell moves under Local Civil Rule 15.1 to amend his memorandum. See [D.E. 86]. L-3 and QSL do not object to Swindell's motion. See id. Swindell's motion complies with this court's local rule. See [D.E. 86, 86-1, 86-2]; E.D.N.C. Civ. R. 15(a). Thus, the court grants Swindell's motion.

13

imputing liability for actions of an employee to an employer. See, e.g., EEOC v. Xerxes Corp., 639 F.3d 658, 669 (4th Cir. 2011). Thus, the court applies the Burton standard concerning a joint employer's liability for actions of a co-employer to Swindell's Title VII and section 1981 claims.

III.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

14

## A.

Swindell alleges a hostile work environment claim under Title VII against QSL and L-3. To demonstrate a hostile work environment claim under Title VII, an employee must prove that (1) he experienced unwelcome conduct, (2) the conduct was based on a protected characteristic under Title VII, (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) the conduct is imputable to the employer. See, e.g., Perkins v. Int'l Paper Co., 936 F.3d 196, 207–08 (4th Cir. 2019); Parker v. Reema Consulting Servs., Inc., 915 F.3d 297, 302 (4th Cir. 2019); Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (en banc); Okoli v. City of Balt., 648 F.3d 216, 220 (4th Cir. 2011); EEOC v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 327 (4th Cir. 2010); Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir. 2008); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc); Coleman v. Altec, Inc., No. 5:16-CV-954-D, 2018 WL 4289610, at *3 (E.D.N.C. Sept. 7, 2018) (unpublished); Brown v. Wake Cty. Gov't, No. 5:16-CV-806-D, 2017 WL 2982971, at *5 (E.D.N.C. July 12, 2017) (unpublished). An employee also must show that his protected characteristic under Title VII was the "but for" cause of the alleged harassment. See, e.g., Gilliam v. South Carolina Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007). Summary judgment is appropriate if "the facts are clearly insufficient to satisfy the standard," but not if there is a "close question and reasonable minds could differ when weighing all the facts against the law." Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 208 (4th Cir. 2014) (quotations omitted).

To determine whether conduct was sufficiently severe or pervasive to alter the employee's terms and conditions of employment and create an abusive working environment based on a protected characteristic, the court examines the allegations both subjectively and objectively. See, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993). First, the employee must subjectively consider the conduct to be sufficiently severe or pervasive as to alter his conditions of employment. See, e.g., Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001) (per curiam); Faragher v.

City of Boca Raton, 524 U.S. 775, 787–88 (1998); Boyer-Liberto, 786 F.3d at 277. Second, a court views the conduct from the perspective of a reasonable person in the employee's position to determine whether it is objectively severe or pervasive. See, e.g., Breeden, 532 U.S. at 271; Faragher, 524 U.S. at 787–88; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81–82 (1998); Boyer-Liberto, 786 F.3d at 277.

The objective component helps courts "to police the baseline for hostile environment claims." Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) (quotation omitted). The court considers all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Forklift Sys., Inc., 510 U.S. at 23; see Parker, 915 F.3d at 304. The conduct must be severe or pervasive to be actionable. See Forklift Sys., Inc., 510 U.S. at 23; Faragher, 524 U.S. at 787–88; Boyer-Liberto, 786 F.3d at 277–78. Title VII does not create "a general civility code for the American workplace." Oncale, 523 U.S. at 80; see Irani v. Palmetto Health, 767 F. App'x 399, 416 (4th Cir. 2019) (per curiam) (unpublished). Rather, the "conduct must . . . amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788; see Boyer-Liberto, 786 F.3d at 277–81. Simple teasing, sporadic rude language, offhand comments, jokes related to a protected status, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68–69 (2006); Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 788; cf. Boyer-Liberto, 786 F.3d at 277–81. Likewise, mere rude or insensitive treatment cannot sustain a hostile work environment claim. See, e.g., Bonds v. Leavitt, 629 F.3d 369, 385–86 (4th Cir. 2011); Baqir v. Principi, 434 F.3d 733, 746–47 (4th Cir. 2006); see also Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81–82; cf. Boyer-Liberto, 786 F.3d at 277–81; Walker 775 F.3d at 207–10; Freeman v. Dal-Tile Corp., 750 F.3d 413, 420–24 (4th Cir. 2014); Okoli, 648 F.3d at 220–22. "The

16

real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by simple recitation of the words used or physical acts performed." Oncale, 523 U.S. at 81–82. "Common sense, and appropriate sensitivity to social context," will enable courts to distinguish between teasing, distasteful jokes, sporadic rude language, vulgarity, stupidity, offhand comments, and insensitive treatment and "conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive" based on a protected characteristic. Id. at 82 (emphasis added); Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772–73 (4th Cir. 1997).

Although hostile work environment claims often involve repeated conduct, an "isolated incident of harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is extremely serious." Boyer-Liberto, 786 F.3d at 277 (quotations and alterations omitted); see Pryor v. United Air Lines, Inc., 791 F.3d 488, 496 (4th Cir. 2015); Okoli, 648 F.3d at 220 & n.5. Furthermore, in assessing the severity of the harassing conduct, the status of the harasser is an important factor. See Boyer-Liberto, 786 F.3d at 278; Sonnier v. Diamond Healthcare Corp., 114 F. Supp. 3d 349, 356 (E.D. Va. 2015). A "supervisor's power and authority invests his or her harassing conduct with a particular threatening character." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (1998); see Boyer-Liberto, 786 F.3d at 278.

To impute liability to an employer for an employee's harassment, a plaintiff must demonstrate that "after having acquired actual or constructive knowledge of the harassing conduct, the employer had taken no prompt and adequate remedial action to correct it." Mikels v. City of Durham, 183 F.3d 323, 329 (4th Cir. 2009) (alteration and quotation omitted) (collecting cases); see Pryor, 791 F.3d at 498; Freeman, 750 F.3d at 423; Xerxes Corp., 639 F.3d at 669; EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 319 (4th Cir. 2008). As for an employer's remedial actions, "Title VII requires only that the employer take steps reasonably likely to stop the harassment." Xerxes Corp., 639 F.3d at 669; Bazemore v. Best Buy, 957 F.3d 195, 202 (4th Cir. 2020). In assessing remedial

17

actions, the court must consider, inter alia, "the promptness of the employer's investigation when a complaint is made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective" in stopping the conduct of which plaintiff complains. Xerxes Corp., 639 F.3d at 669; see Bazemore, 957 F.3d at 202; Pryor, 791 F.3d at 498. "[S]o long as discipline is reasonably calculated to end the [offensive] behavior, the exact disciplinary action lies within [the employer's] discretion." Bazemore, 957 F.3d at 202. "A remedial action that effectively stops the harassment will be deemed adequate as a matter of law." Xerxes Corp., 639 F.3d at 670; Bazemore, 957 F.3d at 201–02.

Swindell argues that the cumulative effect of ten comments during a seven-week period of his nearly five months of employment, when considered in the context of a high-stakes military environment where Swindell was the sole African-American contractor on the Red Team for Dagger II, created a racially hostile work environment. See [D.E. 86-1] 17–25.[5] In support, Swindell cites

---

[5] The parties include the ten comments in their briefs and address the comments in their arguments. See [D.E. 62] 12–13; [D.E. 69] 13–14. The court describes each below and considers all ten in its analysis.

During Swindell's first training period (March 16 to March 26, 2015), Swindell overheard a training classmate, Rob (LNU), speaking with another co-worker and discussing an older white woman Rob knew who referred to black people as "coloreds." Swindell Dep. [D.E. 63-2] 117. Rob said, "Who am I to tell her to stop calling 'them' coloreds. She's been doing it for so long. She's just a harmless old white lady. Well, they are colored aren't they." Id. at 117.

During the same training period, Swindell overheard Marion Spencer of QSL and Dick Holden of L-3 talking about black people and swimming. Spencer opined that black people could not swim due to body makeup or muscle mass or genetics. See id. at 119. Holden responded that he thought black people just did not like to swim. See id.

During Swindell's second training period (March 23 to April 3, 2015), a military member discussed with one of Swindell's classmates how to use white lines in a computer program to outline a military target (as opposed to red lines, blue lines, or black lines). After explaining this requirement to use white lines to outline a target, the military member said to the classmate, "White power. No offense, Swindell." See id. at 121–23.

On April 9, 2015, Swindell overheard a conversation between an 18-year old black military member and a GeoOwl employee in which the white GeoOwl employee asked the black military member how many people in his family had gone to college. Before the military member could answer, the GeoOwl employee then said, "I'm not just saying that because you are black kid. Me and my brother were the first to go to college in my family." See id. at 128–30. According to

three cases. See Strothers v. City of Laurel, 895 F.3d 317 (4th Cir. 2018); Gusseous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016); Etefia v. E. Balt. Comm. Corp., 2 F. Supp. 2d 751 (D. Md. 1998). Swindell argues that the cited cases stand for the proposition that the cumulative effect of the ten racial comments, plus negative performance reviews and statements from Rob Harrison and Clark Hovland after the meeting on May 31, 2015, that Swindell subjectively perceived as a threat, create a genuine issue of material fact whether Swindell's work place was racially abusive or hostile.

Defendants do not dispute that a reasonable jury could find that Swindell subjectively

---

Swindell, the military member "brushed" off the question "like it was nothing." Id. at 130.

On May 27, 2015, Swindell was assigned to work with Rob Harrison. See id. at 136. The day before Swindell's team had worked late. See id. at 130–36. When Rob Harrison sat down in a chair next to Swindell to work, Swindell asked, "How are you?" Id. at 136. Harrison responded, "I'm not doing good because I have to work with you and I know I'm going to have to get out of here late." Id. at 136. A few minutes later, Rob Harrison then "[r]andomly" told Swindell, "Chris, when I think of EBT, I think of you." See id. at 136–37. Swindell believed "EBT" was a reference of Electronic Benefit Transfer. See id.

On May 28, 2015, during a shift changeover, a black military member asked the group if humans have veins in their stomachs. Rob Harrison replied, "You wouldn't be able to see the veins in your stomach because you are black." Id. at 138.

On May 28, 2015, Rob Harrison and a black military member discussed black people's ability to swim. See id. at 139. Rob Harrison asked why black people can't swim. Id. The military member responded that he could not swim. Id. Rob Harrison then asked Swindell if he could swim. Swindell said, "Yes." Id. Harrison then looked at the military member and said, "see . . . he can swim." Id. at 140.

On May 28, 2015, Rob Harrison told a female Riverside Research contract employee that "You couldn't take a black man's banana and that you would slip and fall in your va-jay-jay juice." See id. at 140. According to Swindell, Rob Harrison and this female employee "always had very explicit sexual conversations." Id. at 141.

On May 30, 2015, Swindell and two government employees discussed whether an individual would feel safer in Southeast D.C., or in Yemen. Swindell opined that he would feel safer in D.C. even though it has the worst crime rate in the U.S. and Yemen has some of the worst crime in the world. Id. at 147. One government employee responded to Swindell, "No, you couldn't fit in in Yemen because you are a bigger black guy and Africans are skinny." Id.

During the week of June 1, 2015, Swindell and two government employees discussed the television show House of Cards. Id. at 148. Swindell stated that, if he were on the show, he would play the role of a politician. A government employee replied "No, I would see you as the black guy who owns the rib joint." Id. at 193.

perceived his work environment as racially abusive or hostile. As for the objective prong, even viewing the evidence in a light most favorable to Swindell, no rational jury could find that Swindell's work environment was racially abusive or hostile. Only four of the ten comments were directed at Swindell. Moreover, the comments took place from March 16, 2015, to the week of June 1, 2015, during Swindell's nearly five months of employment, and ended (with one exception) following Swindell's complaint of May 30 and the meeting on May 31, 2015, to address the inappropriateness of racial comments or a hostile work environment. The ten comments did not include physical threats directed at Swindell. The ten comments also did not concern a disciplinary action or termination decision directed at Swindell. No supervisor of Swindell made the comments, and the comments were unrelated to the negative performance feedback that Swindell received in March and April 2015 and on May 30–31, July 12, July 21, July 27, and July 28. Cf. Forklift Sys., Inc., 510 U.S. at 23; Parker, 915 F.3d at 304; Irani, 767 F. App'x at 415–17; Fox v. Leland Volunteer Fire/Rescue Dept., Inc., 648 F. App'x 290, 293 (4th Cir. 2016) (per curiam) (unpublished); Hartsell, 123 F. 3d at 771–74. Moreover, Swindell's subjective belief that Rob Harrison and Clark Hovland's comments after the May 31, 2015 meeting were a threat does not change the calculus. Cf. Scoggins v. Lee's Crossing Homeowner's Ass'n, 718 F.3d 262, 274 (4th Cir. 2013); Williams v. Henderson, 129 F. App'x 806, 814 (4th Cir. 2005) (per curiam) (unpublished); Williams v. Giant Food Inc., 370 F.3d 423, 433 (4th Cir. 2004). Viewed objectively, Rob Harrison's and Clark Hovland's comments to Swindell following the May 31, 2015 meeting were not threats. Cf. Irani, 767 F. App'x at 415–17; Pryor, 791 F.3d at 490–91; Boyer-Liberto, 786 F.3d at 269–71.

"In a perfect world, each workplace would be entirely harmonious and no . . . co-worker would ever make an insensitive comment, irritate a colleague, or engage in a petty slight." Iskander v. Dep't of Navy, 116 F. Supp. 3d 669, 676–77 (E.D.N.C. 2015). Common experience and collective wisdom teach, however, that people are not angels. Some people are petty, offensive, ignorant, and unkind. "Congress and the Supreme Court . . . have made clear that Title VII does not

require . . . a utopian workplace in order for an employer to avoid liability for a hostile work environment." Iskander, 116 F. Supp. at 677. The ten comments that Swindell heard from co-workers from March 16, 2015, to the week of June 1, 2015, during his employment from March 3, 2015, to July 28, 2015, were insensitive, offensive utterances.[6] Nonetheless, viewing the entire record in the light most favorable to Swindell, no rational jury could find the insensitive offensive utterances sufficiently "severe" or "pervasive" to create a racially hostile work environment under Title VII. See, e.g., Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Irani, 767 F. App'x at 415–17; Leavitt, 629 F.3d at 385–86; Baqir, 434 F.3d at 746–47; Hartsell, 123 F.3d at 771–74; see also Oncale, 523 U.S. at 81–82; cf. Boyer-Liberto, 786 F.3d at 277–81; Walker, 775 F.3d at 207–10; Freeman, 750 F.3d at 420–24; Okoli, 648 F.3d at 220–22.

The cases upon which Swindell relies are distinguishable. Specifically, Strothers, Guessous, and Etifia concerned supervisory employee's actions toward and interactions with the respective plaintiffs. See Strothers, 895 F.3d at 333–35; Guessous, 828 F.3d at 211–15; Etefia, 2 F. Supp. 2d at 754–55. As for Swindell's argument concerning his classmate "Rob's" statement that an unknown older white lady he knew used the term "coloreds," Swindell does not argue that the comment was directed to him. Rather, Swindell overheard "Rob" use the term in a conversation concerning an older white woman's use of the term. See, e.g., [D.E. 80-5] 2. In that context, the use of the term

---

[6] Swindell asserts in his statement of facts that on an unknown date Rob Harrison stated to African-American Private First Class Glenn Gamble that he would not make a good "house negro." See [D.E. 77] ¶ 34. L-3 Program Manager Jim Moore testified that Will Malave reported to him that someone had reported to Malave that Rob Harrison used the phrase "house negro" in the workplace. See Moore Dep. [D.E. 80-21] 7–8, 11. Malave testified that he received the report from Matt Nelson. See Malave Dep. [D.E. 80-17] 22. After Malave received the report, Malave counseled Rob Harrison that he had received the report and that such language would not be tolerated. See Moore Dep. [D.E. 80-21] 7–8. Swindell testified that he never heard anyone use the term "house negro" or the racial epithet "n*****". See Swindell Dep. [D.E. 80-26] 57; see also Ulloa Dep. [D.E. 80-23] 31. Swindell did not learn of Rob Harrison's use of the term "house negro" until after his employment ended. Thus, this alleged offensive comment of Rob Harrison was not part of Swindell's work environment.

21

does not establish a racially hostile work environment. See Savage v. Maryland, 896 F.3d 260, 276–77 (4th Cir. 2018). Accordingly, the court grants summary judgment to L-3 and QSL concerning Swindell's hostile work environment claim.

Alternatively, even if the conduct was sufficiently severe or pervasive, no rational jury could find L-3 liable under Title VII. See, e.g., Bazemore, 957 F.3d at 201–03. On May 31, 2015, L-3 Team Lead Malave notified Government Team Chief Matt Craig about Swindell's complaint of May 30, 2015. On May 31, 2015, Craig then held a meeting with all personnel and stated that making racial comments or creating a hostile work environment was against policy and would not be tolerated. After the government personnel left, Malave held a Red Team meeting, and reiterated L-3's prohibition on racial comments and stated that L-3 would not tolerate such comments or a hostile work environment. Malave also counseled Rob Harrison. The only racial comment Swindell records following the May 31, 2015 meeting is the House of Cards conversation that Swindell had with a government employee. Swindell does not identify any evidence showing that L-3 knew about that conversation, that he reported the conversation, or that L-3 should have known about it. See Swindell Dep. [D.E. 80-26] 35. Moreover, an L-3 employee did not participate in the House of Cards conversation. Thus, even viewing the record in the light most favorable to Swindell, L-3's remedial actions were effective. See, e.g., Bazemore, 957 F.3d at 201–03; Burton, 798 F.3d at 228; Xerxes Corp., 639 F.3d at 670; Velasquez, 2018 WL 1773128, at *3; Crump, 2016 WL 901262, at *1–2; Williams, 988 F. Supp. at 937–38. Accordingly, the court grants L-3 summary judgment concerning Swindell's hostile work environment claim.

In opposition, Swindell argues that L-3 had actual knowledge of racial harassment of Swindell and is jointly responsible with QSL for it. See [D.E. 86-1] 24–25. In support, Swindell cites Sunbelt Rentals Inc., and argues that L-3 failed to take sufficient corrective action after his complaint on May 30, 2015, and was willfully blind to Swindell's complaint. See [D.E. 86-1] 26, 29–30.

22

Even viewing the record in the light most favorable to Swindell, no rational jury could find that L-3 had actual knowledge of the alleged comments that offended Swindell and failed to take corrective action. On the contrary, Swindell spoke with L-3 Team Lead Malave during the evening of May 30, 2015, about comments that offended him. Malave immediately notified Government Team Chief Matt Craig of Swindell's complaint on May 31, 2015. On the same date, May 31, 2015, Malave counseled Rob Harrison about inappropriate comments in the workplace. After that counseling session, and on the same date, Malave and Craig held a Red Team meeting concerning racial comments and the work environment and stated that such comments or a hostile work environment would not be tolerated. Malave then discussed the comments again with contractor personnel immediately following the meeting and again stated that racial comments were not acceptable. After the meeting on May 31, 2015, Swindell did not hear any racially offensive comments by L-3 or QSL personnel. See Swindell Dep. [D.E. 80-26] 35, 45–46. Moreover, as discussed, no rational jury could find that L-3 knew, should have known, or intentionally failed to know about that government employee's comment during Swindell's House of Cards conversation. Accordingly, the court rejects Swindell's arguments concerning willful blindness.

As for Sunbelt Rentals, Inc., the plaintiff in that case made "frequent complaints" to his supervisor and filed a complaint with defendant company's HR department that referenced his complaints. Yet the supervisor "allowed the harassment to continue" without sanctioning or reprimanding the offender. Sunbelt Rentals, Inc., 521 F.3d at 319–20. Not so here. Swindell complained to L-3 on May 30, 2015, and L-3 immediately and effectively addressed the racial comments about which Swindell complained. See, e.g., Bazemore, 957 F.3d at 201–03.

As for QSL, even viewing the evidence in a light most favorable to Swindell, no rational jury could find that QSL is liable under Title VII concerning the ten comments about which Swindell complains. Although a harassment policy and complaint procedure do not absolve QSL of liability, the court considers both when determining whether the company "exercised reasonable care to

23

prevent discrimination." Xerxes Corp., 639 F.3d at 669. QSL's policy handbook prohibits harassment based on race. See [D.E. 70-1] 230–33. QSL's policy handbook also describes the process for reporting harassment. See id. The employee must first contact QSL's human resources department at a telephone number provided in the policy book. Id. QSL promises to "investigate the report and then take prompt, appropriate remedial action." Id. Additionally, QSL's policy "protect[s] the confidentiality of employees reporting suspected violations to the extent possible consistent with our investigation." Id.

Swindell did not report any of the ten comments he identifies to QSL's Human Resources representative, and does not dispute that he knew of and signed the policy. See Swindell Dep. [D.E. 70-1] 157–59; [D.E. 70-1] 230–33. The policy was adequate. See Howard v. Winter, 446 F.3d 559, 567–69 (4th Cir. 2006); Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 268–69 (4th Cir. 2001); Barrett v Applied Radiant Energy Corp., 240 F.3d 262, 266–67 (4th Cir. 2001); cf. Ocheltree, 335 F.3d at 334. Moreover, QSL exercised reasonable care to correct promptly the comments after Swindell's complaint to QSL on July 12, 2015. Swindell concedes that the first date he reported the alleged harassment to QSL was on July 12, 2015, when he spoke to QSL Director of Operations Jason Sawyer. See Swindell Dep. [D.E. 80-26] 43, 65. Sawyer told Swindell that QSL would address the concerns and gave Swindell two days off. Sawyer then immediately spoke with his superiors at QSL and Jim Moore at L-3 concerning Swindell's reports of alleged retaliation for his complaints about racial comments. Sawyer also counseled Rob Harrison about inappropriate comments in the work place. Moore also promptly counseled Rob Harrison about his unprofessional comments. QSL also issued a directive for all QSL employees to take follow-up EO training on the QSL anti-harassment policy and to immediately report EO issues. Sawyer and QSL Human Resources Representative Pixley also set up a call with Swindell for July 23, 2015, to discuss Swindell's concerns. On July 22, 2015, Swindell canceled the scheduled call. Swindell does not identify any comment after July 12, 2015, that he considered racially hostile. See Swindell Dep.

24

[D.E. 80-26] 35, 46. On this record, QSL took effective remedial action. See, e.g., Bazemore, 957 F.3d at 201–03; Pryor, 791 F.3d at 498; Xerxes Corp., 639 F.3d at 669.

In opposition, Swindell argues that QSL had actual knowledge of "the nature of the harassment" and was willfully blind to it. In support, Swindell asserts that L-3 Team Lead Malave told L-3 Program Manager Moore about Rob Harrison's alleged "house negro" comment to Private First Class Glenn Gamble. Second, Swindell notes that Moore testified "anything of that nature [i.e., racially hostile comments] would include QSL as part of the discussion." [D.E. 86-1] 26. Additionally, Swindell asserts that QSL did not act with reasonable care in ensuring that QSL's anti-harassment policy was effective because QSL did not fire Rob Harrison, enforce a discipline plan against him, or conduct sufficient equal opportunity ("EO") training. See id. at 26–27. Swindell also argues that Rob Harrison was his supervisor under Title VII. See id. at 29–30.

The court rejects Swindell's arguments. As for Rob Harrison, there is no genuine issue of material fact concerning whether Rob Harrison was Swindell's supervisor. Swindell testified that Rob Harrison was not his supervisor. See Swindell Dep. [D.E. 80-26] 19, 62–63; see also Sawyer Dep. [D.E. 80-19] 8–9. Rather, Swindell testified that Will Malave and then Steve Loori was his supervisor. See Swindell Dep. [D.E. 70-1] 110, 158. As for QSL and Swindell, the relevant questions are when did Swindell report offensive comments to QSL, what did QSL do in response, and did QSL's response effectively end the alleged harassment of Swindell. Even viewing the record in the light most favorable to Swindell, QSL took effective action following the conversation of July 12, 2015, between Swindell and Sawyer. That conversation was the first conversation in which Swindell complained to QSL about an alleged racially hostile work environment. QSL (through Sawyer) promptly counseled Rob Harrison as did L-3 (through Moore). QSL also set up a meeting with Swindell on July 23, 2015, to address his concerns. Swindell, however, cancelled the meeting with Sawyer and QSL Human Resources scheduled for July 23, 2015. QSL also issued a directive for equal-opportunity training on QSL's non-harassment policy and to immediately report equal

25

opportunity issues. Moreover, Swindell admits that he did not hear any racially hostile comments following his conversation with Sawyer on July 12, 2015. At bottom, Swindell's arguments boil down to what he thinks would have been an appropriate response of QSL to comments that Swindell never reported to QSL until July 12, 2015. But that is not the test. See Barrett, 240 F.3d at 268 ("Little can be done to correct . . . objectionable behavior unless the victim first blows the whistle on it."). On this record, no rational jury could find that QSL's actions were not effective in correcting the racially offensive comments about which Swindell complained. See Bazemore, 957 F.3d at 201–03; Pryor, 791 F.3d at 498; Xerxes Corp., 639 F.3d at 669. Accordingly, the court grants summary judgment to QSL concerning Swindell's hostile work environment claim.[7]

Alternatively, QSL is entitled to summary judgment concerning Swindell's hostile work environment claim under the Faragher-Ellerth defense. Although QSL did not assert the Faragher-Ellerth defense in its answer to Swindell's amended complaint, both parties address the defense in summary judgment briefing. See [D.E. 69] 19–22; [D.E. 86-1] 29–30. Additionally, Swindell does not assert that he was surprised or prejudiced by QSL's assertion of the defense. Cf., e.g., Patten Grading & Paving v. Skanska USA Building, Inc., 380 F.3d 200, 205 n.3 (4th Cir. 2004) ("[I]t is well established that an affirmative defense is not waived absent unfair surprise or prejudice). Accordingly, the court addresses QSL's Faragher-Ellerth defense. See Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1258–59 (11th Cir. 2014); Robinson v. Sappington, 351 F.3d 317, 332–33 (7th Cir. 2003).

---

[7] Assuming without deciding that QSL had notice of Swindell's complaints on May 30, 2015, QSL also had notice of the remedial action of the government and L-3 on May 31, 2015. After L-3's remedial action, the only individual to make a racial comment to Swindell was the unidentified government employee who made a comment to Swindell during their House of Cards conversation during the week of June 1, 2015. Swindell did not report that comment to QSL, and QSL had no way to know about that comment. On this record, no rational jury could find that QSL's response on May 31, 2015, was ineffective. See Bazemore, 957 F.3d at 201–03; Burton, 798 F.3d at 228; Velasquez, 2018 WL 1773128, at *3; Crump, 2016 WL 901262, at *1–2; Williams, 988 F. Supp. at 937–38.

Under Faragher-Ellerth, an employer can assert an affirmative defense for unlawful co-worker harassment. See Faragher, 524 U.S. at 807–08. Likewise, if a supervisor subjects a subordinate employee to unlawful harassment, but the supervisor's unlawful harassment does not culminate in tangible employment action, then the employer may also present the affirmative defense. See Faragher, 524 U.S. at 807–08; Ellerth, 524 U.S. at 762–63, 765; Barrett, 240 F.3d at 265–66; Brown v. Perry, 184 F.3d 388, 394–97 (4th Cir. 1999); Lissau v. S. Food Serv., Inc., 159 F.3d 177, 182 (4th Cir. 1998) ("Tangible employment actions, if not taken for discriminatory reasons, do not vitiate the affirmative defense. If [plaintiff's] termination did not result from a refusal to submit to [her supervisor's] unlawful harassment, then [the employer] may advance [the affirmative] defense."). The Faragher-Ellerth affirmative defense requires the employer to prove: (1) "that the employer exercised reasonable care to prevent and to correct promptly any . . . harassing behavior," and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765; Barrett, 240 F.3d at 265–66; Lissau, 159 F.3d at 182; Swann v. Source One Staffing Solutions, 778 F. Supp. 2d 611, 618–22 (E.D.N.C. 2011).

As discussed, QSL took reasonable care to promptly address the comments about which Swindell complained, and Swindell acted unreasonably when he failed to follow the procedures for complaints in the QSL employee handbook. Thus, even viewing the evidence in the light most favorable to Swindell, QSL has proven the Faragher-Ellerth affirmative defense.

In opposition, Swindell makes two arguments. First, Swindell argues that the Faragher-Ellerth defense is not available to QSL because Rob Harrison was Swindell's supervisor, and Rob Harrison's harassment led to the termination of Swindell's employment. See [D.E. 86-1] 29–30. Second, Swindell argues that QSL's policy was unreasonable because it provided only a phone number for human resources. See id.

The court rejects Swindell's arguments. As discussed, Swindell testified that Rob Harrison

27

was not his supervisor. Rather, Will Malave was his supervisor as the Red Team Lead and then Steve Loori was. In any event, even viewing the evidence in a light most favorable to Swindell, no rational jury could find a causal connection between Rob Harrison's offensive racial comments in May 2015 and the termination of Swindell's employment on July 28, 2015. Thus, QSL can assert the affirmative defense. See Faragher, 524 U.S. at 807–08; Ellerth, 524 U.S. at 762–63; Barrett, 240 F.3d at 265–66; Lissau, 159 F.3d at 182; Swann, 778 F. Supp. 2d at 618–22.

As for QSL's policy, Swindell signed the policy, and the court already has detailed why the policy was adequate, how Swindell unreasonably failed to notify QSL of his concerns until July 12, 2015, and how QSL exercised reasonable care to promptly correct the alleged harassing behavior once Swindell notified QSL. Thus, the court grants summary judgment to QSL concerning Swindell's hostile work environment claim.

## B.

Swindell alleges that L-3 and QSL terminated his employment in retaliation for complaining about a racially hostile work environment and thereby violated Title VII. See Am. Compl. [D.E. 13] ¶¶ 43–48. Title VII prohibits an employer from taking adverse employment action against an employee "because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).[8] A plaintiff may establish a Title VII or section 1981 violation in two ways. First, a plaintiff can show through direct evidence that retaliation or racial discrimination motivated an employer's adverse employment action. See, e.g., Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). If a plaintiff lacks direct evidence (as in this case), a plaintiff can alternatively proceed under the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013).

---

[8] The court assumes without deciding that both QSL and L-3 are Swindell's "employers" for Title VII purposes.

"The McDonnell Douglas framework is comprised of three steps: (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." Guessous, 828 F.3d at 216. The McDonnell Douglas framework applies to claims under Title VII and section 1981. See, e.g., Giant Food Inc., 370 F.3d at 430; Beall v. Abbott Labs, 130 F.3d 614, 619 (4th Cir. 1997), abrogated in part on other grounds by Gilliam, 474 F.3d at 140.

If the plaintiff establishes a prima facie case, the burden shifts to the defendant employer to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant employer offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the defendant employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted); see Reeves, 530 U.S. at 147.

In analyzing the record concerning pretext, the court does not sit to decide whether the employer in fact discriminated against the plaintiff on an illegal basis. See, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279–80 (4th Cir. 2000). Rather, the court focuses on whether the plaintiff has raised a genuine

29

issue of material fact as to pretext under <u>Reeves</u> and its Fourth Circuit progeny. Under <u>Reeves</u> and its Fourth Circuit progeny, a plaintiff may not "simply show the articulated reason is false; he must also show that the employer discriminated against him on the basis of [race]." <u>Laber v. Harvey</u>, 438 F.3d 404, 430–31 (4th Cir. 2006) (en banc). In certain cases, however, the factfinder may infer illegal discrimination from the articulated reason's falsity. <u>See id.</u> at 431; <u>Rowe v. Marley Co.</u>, 233 F.3d 825, 830 (4th Cir. 2000).

To establish a prima facie case of retaliation, Swindell must prove that (1) he engaged in protected activity under Title VII, (2) his employer took some action against him that a reasonable employee would find materially adverse, and (3) his employer took the adverse action because of the protected activity. <u>See DeMasters v. Carilion Clinic</u>, 796 F.3d 409, 416 (4th Cir. 2015); <u>Boyer-Liberto</u>, 786 F.3d at 281; <u>Balas v. Huntington Ingalls Indus., Inc.</u>, 711 F.3d 401, 410 (4th Cir. 2013); <u>see also White</u>, 548 U.S. at 67–70. "Retaliation claims . . . require the employee to show that retaliation was a but-for cause of a challenged adverse employment action." <u>Guessous</u>, 828 F.3d at 217 (citation and quotation omitted); <u>see Huckelba v. Deering</u>, No. 5:16-CV-247-D, 2016 WL 6082032, at *3 (E.D.N.C. Oct. 17, 2016) (unpublished). "Naked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation do not state a plausible Title VII claim." <u>Huckelba</u>, 2016 WL 6082032 at *3. Furthermore, the employee must demonstrate temporal proximity between the alleged retaliation and the protected activity. <u>See Breeden</u>, 532 U.S. at 273–74; <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 278 (4th Cir. 2001); <u>Huckelba</u>, 2016 WL 6082032, at *4.

The court assumes without deciding that Swindell has alleged a prima facie case of retaliation. In turn, QSL's and L-3's reason for terminating Swindell's employment – poor performance – is legitimate and non-discriminatory. <u>See, e.g., Vannoy v. Fed. Reserve Bank of Richmond</u>, 827 F.3d 296, 304–05 (4th Cir. 2016). Accordingly, the burden shifts to Swindell to demonstrate that there is a genuine issue of material fact about pretext.

Swindell makes three arguments concerning pretext. First, Swindell argues that the testimony in support of defendants' proffered explanation for Swindell's termination is not credible. Specifically, Swindell argues that Contracting Officer Representative Sargent's testimony lacks credibility because his emails demonstrate that L-3 made the decision to terminate Swindell's employment. Sargent also sent an email the day after Swindell's termination that mentioned Swindell was on a "witch hunt" and may "make a claim against someone." See [D.E. 70-1] 221 (Sargent email of July 29, 2015). Swindell suggests that Sargent's email demonstrates that L-3 and the government were orchestrating Swindell's firing. Additionally, Swindell claims that Joel Harrison (the senior civilian deputy commander) testified that he did not recall hearing about Swindell's May 30 racial complaints, but Government Team Chief Craig emailed Joel Harrison and others on May 31, 2015, to discuss Swindell's racial complaints to Malave and Craig. See [D.E. 86-1] 31–34; cf. Jacobs v. North Carolina Admin. Off. of the Courts, 780 F.3d 562, 574–75 (4th Cir. 2015). Second, Swindell argues that the time line concerning the termination of Swindell's employment "leads to a reasonable inference of pretext." [D.E. 86-1] 34. Third, Swindell argues that comparator evidence demonstrates pretext. Specifically, Swindell argues that it was "very rare" that L-3 would fire someone for poor performance, and that Loori recalled five to ten other analysts disciplined for performance issues, with Swindell being the only one fired. See id. at 36–38.

As for Swindell's third argument, Swindell does not have comparator evidence. Swindell fails to identify a similarly situated Dagger II employee who "dealt with the same supervisor [and was] subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Haynes v. Waste Connections, Inc., 922 F.3d 219, 223–24 (4th Cir. 2019) (alterations and quotation omitted). Rather, he relies on Loori's testimony concerning five to ten unnamed and otherwise unknown Dagger II analysts, and Loori's testimony concerning Lionel Brown. See Loori Dep. [D.E. 80-18] 12–13. Loori's testimony concerning Lionel Brown establishes only that Brown

31

was an analyst who was removed from employment at the government's request for poor performance. See id. Tellingly, Swindell does not rely on the testimony concerning Brown to oppose QSL's and L-3's summary judgment motions. Rightly so. Brown was not treated more favorably. As for the five to ten unidentified employees disciplined for poor performance, Swindell did not identify the circumstances concerning these employees sufficiently to have them serve as comparators. Compare Loori Dep. [D.E. 80-18] 12 with Byers Dep. [D.E. 80-20] 6, 29 (discussing numerous L-3 employees removed from the contract at the government's request). Accordingly, Swindell's third argument does not support falsity or pretext. See Haynes, 922 F.3d at 224; Laing v. Fed. Express Corp., 703 F.3d 713, 721 (4th Cir. 2013).

As for Swindell's first argument, Swindell's allegations concerning "orchestration" are speculative. Essentially, Swindell invites the court to read the term "witch hunt" in Contracting Officer Representative Sargent's email of July 29, 2015, as indicating a conspiracy between L-3 and the government to fire Swindell in retaliation for Swindell's complaints about racial comments. The court declines that invitation. Even viewing the record in a light most favorable to Swindell, no evidence supports Swindell's reading of Contracting Officer Representative Sargent's email. As for Joel Harrison's testimony about the events leading to the government's request of July 28, 2015, to remove Swindell from Dagger II, Swindell does not connect the inconsistency of Joel Harrison's memory about Matt Craig's email of May 31, 2015, with Joel Harrison's recommendation of July 28, 2015. Furthermore, Joel Harrison's testimony that he did not recall Craig's email of May 31, 2015, which discussed Swindell's race-related complaints of May 30, 2015, is unrelated to the termination of Swindell's employment on July 28, 2015, for poor performance. Swindell had performance problems dating back to his initial training. The problems continued in July, after nearly five months of employment. Swindell cannot seek to expose a poor performance rationale as pretextual "by focusing on minor discrepancies that do not cast doubt on the explanations' validity, or by raising points that are wholly irrelevant to it." Hux v. City of Newport News, 451

32

F.3d 311, 315 (4th Cir. 2006). "The former would not create a 'genuine' dispute." Id. (quoting Matsushita Elec. Indus. Co., 475 U.S. at 586–87). The "latter would fail to be 'material.'" Id. (quoting Anderson, 477 U.S. at 248). "[M]ere mistakes of fact are not evidence of unlawful discrimination." Price v. Thompson, 380 F.3d 209, 214 n.1 (4th Cir. 2004), abrogated on other grounds by Foster v. Univ. of Md.-E. Shore, 787 F.3d 243 (4th Cir. 2015). After all, a "[p]retext is a lie, not merely a mistake." Id. Accordingly, even if Joel Harrison mistakenly failed to recall Craig's email of May 31, 2015, that alleged mistake is insufficient to raise a genuine issue of material fact about pretext in this case. See Hux, 451 F.3d at 315; see also Freeman v. N. State Bank, 282 F. App'x 211, 216–17 (4th Cir. 2008) (per curiam) (unpublished); Baldwin v. England, 137 F. App'x 561, 564 (4th Cir. 2005) (per curiam) (unpublished).

In opposition, Swindell cited Jacobs. The alleged inconsistency Swindell identifies, however, is distinguishable from the inconsistencies in Jacobs. In Jacobs, the relevant testimony was from plaintiff's supervisor who both hired and fired plaintiff. The Fourth Circuit observed that while the supervisor claimed her reason for firing plaintiff was plaintiff's sleeping on the job, the supervisor did not mention that reason when terminating plaintiff's employment. Jacobs, 780 F.3d at 576–77. Rather, the supervisor only provided that reason in connection with the litigation. Furthermore, in providing that new reason, the supervisor testified about a conversation with plaintiff during the termination meeting that was "entirely absent from the unaltered audio recording of the meeting." Id. at 576.

Jacobs is distinguishable. Joel Harrison's email of July 28, 2015, concerns Swindell's deficient performance. Moreover, at his deposition, Joel Harrison discussed at length the information he received about Swindell's performance deficiencies during Swindell's five months of employment. Harrison received that information from Matt Craig, other government personnel, and contractor personnel. Unlike in Jacobs, the only reason that Joel Harrison has ever given for his

33

recommendation to remove Swindell from Dagger II was his honest belief about Swindell's poor performance. Accordingly, the court rejects Swindell's first argument.

Swindell's final argument concerns temporal proximity between his protected activity and his termination. Although generally courts consider temporal proximity in the context of plaintiff's prima facie case, see, e.g., Henry v. Vaughn Indus., Inc., 450 F. Supp. 3d 671, 684 (E.D.N.C. 2020), the court may consider temporal proximity concerning pretext. See Reeves, 530 U.S. at 143; Ramos .v Carolina Motor Club, Inc., No. 3:17-cv-00212-RJC-DSC, 2018 WL 3040028, at *8–*9 (W.D.N.C. June 19, 2018) (unpublished); E.E.O.C. v. Safelite Glass Corp., No. 4:10–CV–102–F, 2012 WL 3266333, at *8 (E.D.N.C. Aug. 9, 2012) (unpublished). As discussed, on the evening of May 30, 2015, Swindell notified Malave the L-3 Team Lead of racial comments overheard and directed at Swindell. On May 31, 2015, L-3 took immediate, effective remedial action. Likewise, as discussed, on July 12, 2015, after the government directed Swindell' removal from assignment for poor performance, Swindell told Loori (the new L-3 Team Lead) and Ulloa that he was "targeted" for his complaints about racial comments. On the same date, Loori called Sawyer (QSL's Director of Operations) and told him about Swindell's belief that he was targeted due to complaints about racial comments. Sawyer, in turn, spoke with Swindell and attempted to address Swindell's concerns by giving him two days off, setting up a call to discuss the matter with Swindell and QSL Human Resources on July 23, 2015, and notifying QSL senior management and L-3 Program manager Jim Moore of Swindell's concerns. After speaking with Sawyer and QSL Human Resources, Sawyer and Moore promptly and independently counseled Rob Harrison about his unprofessional comments. Additionally, QSL issued a directive for equal employment training on the company's non-harassment policy and that any alleged harassment should be reported immediately. Sawyer and QSL Human Resources also scheduled a July 23, 2015 call with Swindell to discuss his concerns. On July 22, 2015, Swindell canceled the meeting with Sawyer and QSL's Human Resources Representative.

34

As for pretext, the evidence demonstrates that Swindell's performance issues began during his training beginning on March 9, 2015, and persisted throughout his five-month employment until his termination on July 28, 2015. As discussed, Swindell was recycled through FMV training for Dagger II because he did not meet the expectations of the training staff. Moreover, throughout his tenure on Dagger II, Swindell was assigned a trainer which meant that he was not performing to standard. On July 12, 2015, after removing Swindell from a live mission due to poor performance, Loori and Ulloa prepared a PIP for Swindell and discussed it with him. See Loori Dep. [D.E. 80-18] 15–16; Ulloa Dep. [D.E. 63-2] 178–79. On July 21, 27, and 28, 2015, Shaw observed Swindell's performance and noted various performance deficiencies including, inter alia, off-target calls, poor attention to detail, and submitting an "overview" product with several issues. See Schagne Dep. [D.E. 63-2] 84–86, 90–92, 96–98; Schagne Dep. Ex. [D.E. 64] 2–3.

Swindell obviously disagrees with the government's recommendation to remove him from Dagger II for poor performance, L-3's belief that his performance was poor, and QSL's inability to place him in another position with QSL. However, the "ultimate responsibility" for the decision to remove Swindell from Dagger II and end his employment lies with L-3 and QSL. Mereish, 359 F.3d at 339. Moreover, Swindell's opinion of his own performance is not relevant. It is the perception of the decisionmaker that counts. See King, 328 F.3d at 149; Hawkins, 203 F.3d at 280; Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980). The "crucial issue" is whether "an unlawful[] discriminat[ing] motive for a defendant's conduct [exits], not the wisdom or folly of [the employer's] business judgment." Jiminez v. Mary Washington Coll., 57 F.3d 369, 383 (4th Cir. 1995). "Duty-bound though we are to examine employment decisions for unlawful discrimination, we are not cloaked with authority to strip employers of their basic business responsibilities." Hux, 451 F.3d at 315. Even viewing the evidence in a light most favorable to Swindell, no rational jury could find that the stated reason for terminating Swindell's employment was pretextual. Accordingly, the court

35

grants each defendant's motion for summary judgment concerning Swindell's Title VII retaliation claim.[9]

## C.

Swindell alleges a section 1981 claim against QSL and L-3. Specifically, Swindell alleges that QSL and L-3 discriminated against Swindell "on the basis of his race in violation of 42 U.S.C. § 1981 . . . by retaliating against his with poor performance reviews when he complained of racial

---

[9] Swindell makes another argument concerning QSL's and L-3's liability. Swindell asserts that under Fourth Circuit precedent, L-3 and QSL are liable for the government's employee's alleged illegal motive in terminating Swindell's employment. See [D.E. 86-1] 14–17. In support, Swindell intertwines two strands of Fourth Circuit precedent. First, Swindell asserts that an employer cannot avoid Title VII liability by willful ignorance, and that an employer can be liable for a third party's actions in a Title VII hostile work environment claim. See Freeman, 750 F.3d at 423. Second, Swindell asserts that an employer cannot avoid Title VII liability because its customer wants to fire an employee in retaliation for the employee's complaints of race discrimination. See [D.E. 86-1] 16–17 (collecting cases). From these two lines of cases, Swindell argues that L-3 and QSL are liable under Title VII because they were willfully blind to their third-party customer's (i.e., the government) racial or retaliatory motive in terminating Swindell's employment. See [D.E. 86-1] 14–17.

Even viewing the evidence in a light most favorable to Swindell, no rational jury could find that the government acted with discriminatory animus or retaliatory animus when it recommended terminating Swindell's employment on Dagger II for poor performance on July 28, 2015. Under the customer-animus line of cases, an employer is liable for its customer's animus only as that animus concerned the employer's decision to terminate plaintiff's employment. See Chaney v. Plainfield Healthcare Ctr., 612 F.3d 908, 912–13 (7th Cir. 2010); Ferrill v. Parker Grp., Inc., 168 F.3d 468, 473–75 (11th Cir. 1999); Williams v. G4S Secure Solutions (USA), Inc., 2012 WL 1698282, at *22 (D. Md. May 11, 2012) (unpublished); Hylind v. Xerox Corp., 380 F. Supp. 2d 705, 713 (D. Md. 2005). Joel Harrison and Walter Sargent were the two government employees who recommended on July 28, 2015, terminating Swindell's employment on Dagger II for poor performance. The recommendation said nothing about Swindell's continued employment with QSL or L-3. Rather, given the mission critical nature of the Dagger II contract and Swindell's continued poor performance on a contract where lives were at stake, the government simply wanted Swindell removed from Dagger II. The record belies Swindell's assertion that Joel Harrison and Walter Sargent really did not have performance concerns when they made the recommendation or that Joel Harrison and Walter Sargent acted with discriminatory or retaliatory animus. Cf. Holland, 487 F.3d at 217 (plaintiff failed to show that the decisionmaker did not honestly believe that the plaintiff engaged in misconduct warranting discipline); Hill, 354 F.3d at 293 (plaintiff failed to show that the decisionmaker did not honestly believe that the plaintiff's misconduct warranted discipline). Accordingly, the court rejects Swindell's customer-animus argument.

harassment, and by ultimately terminating his employment." Am. Compl. [D.E. 13] ¶ 51. As with his Title VII retaliation claim, Swindell does not have direct evidence of race discrimination or retaliation. Accordingly, Swindell proceeds under the McDonnell Douglas framework.

The parties agree that Swindell's section 1981 claim "has the same elements as a Title VII retaliation claim." Boyer-Liberto, 786 F.3d at 281; see [D.E. 62] 24–25; [D.E. 69] 31–32; [D.E. 86-1] 38–39. Thus, Swindell's section 1981 claim fails for the same reasons as his Title VII retaliation claim. Accordingly, the court grants QSL's and L-3's motions for summary judgment on Swindell's section 1981 claim.[10]

### D.

Swindell alleges a wrongful discharge in violation of public policy claim under North Carolina law against QSL and L-3. The court assumes without deciding that QSL and L-3 are "employers" for purposes of this analysis. Under North Carolina law, an employer generally may terminate an at-will employee for any reason. Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 568–72, 515 S.E.2d 438, 439–41 (1999). North Carolina recognizes a narrow exception to that general rule if an employee's termination violates North Carolina public policy. See, e.g., Whitt v. Harris Teeter, Inc., 359 N.C. 625, 625, 614 S.E.2d 531, 532 (2005) (per curiam) (adopting dissenting opinion at 165 N.C. App. 32, 43–50, 598 S.E.2d 151, 159–63 (2004) (McCullough, J., dissenting)); Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos v. Oakdale Knitting Co., 331 N.C. 348, 350–54, 416 S.E.2d 166, 167–70 (1992); Coman v. Thomas Mfg. Co., 325 N.C. 172, 176–78, 381 S.E.2d 445, 447–49 (1989). To prove a claim of wrongful discharge in violation of North Carolina public policy, a plaintiff must identify and rely upon a specific North Carolina statute or North Carolina constitutional provision stating North Carolina's public policy. See Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos, 331 N.C. at 350–54, 416 S.E.2d at 167–70; Coman, 325 N.C.

---

[10] In light of this conclusion, the court declines to address L-3's argument concerning its lack of a contractual relationship with Swindell.

at 176, 381 S.E.2d at 447; Horne v. Cumberland Cty. Hosp. Sys., Inc., 228 N.C. App. 142, 146, 746 S.E.2d 13, 17–19 (2013); Gillis v. Montgomery Cty. Sheriff's Dep't, 191 N.C. App. 377, 379–81, 663 S.E.2d 447, 449–50 (2008); Whiting v. Wolfson Casing Corp., 173 N.C. App. 218, 222, 618 S.E.2d 750, 753 (2005); Considine v. Compass Grp. USA, Inc., 145 N.C. App. 314, 321, 551 S.E.2d 179, 184, aff'd, 354 N.C. 568, 557 S.E.2d 528 (2001) (per curiam).

Swindell relies on N.C. Gen. Stat. § 143-422.2 as the source of North Carolina's public policy.[11] Swindell contends that defendants terminated his employment in retaliation of complaints about race discrimination and due to his race.

Section 143-422.2 does not create a private right of action for retaliation or provide a source of public policy concerning retaliation. See, e.g., Whitt, 359 N.C. at 625, 614 S.E.2d at 532; McLean v. Patten Cmtys., Inc., 332 F.3d 714, 719 (4th Cir. 2003); Swann, 778 F. Supp. 2d at 622–23; Haley v. Wal-Mart Stores E., L.P., No. 5:07-CV-219-D, 2008 WL 5069073, at *4 (E.D.N.C. Nov. 17, 2008) (unpublished); Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 544 (E.D.N.C. 2008); Efird v. Riley, 342 F. Supp. 2d 413, 428 (M.D.N.C. 2004); Stout v. Kimberly Clark Corp., 201 F. Supp. 2d 593, 607 (M.D.N.C. 2002); Bradley v. CMI Indus., Inc., 17 F. Supp. 2d 491, 499 (W.D.N.C. 1998). Accordingly, the court grants summary judgment to defendants to

---

[11] N.C. Gen. Stat. § 143-422.2 states:

(a) It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

(b) It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

N.C. Gen. Stat. § 143-422.2.

38

the extent Swindell asserts a retaliation claim under North Carolina law.

As for Swindell's wrongful discharge claim based on race, it fails for the same reason that his Title VII and section 1981 claims fail. See Henson v. Liggett Grp., Inc., 61 F.3d 270, 277 (4th Cir. 1995); Coleman v. Altec, Inc., No. 5:16-CV-954-D, 2018 WL 4289610, at *7 (E.D.N.C. Sept. 7, 2018) (unpublished); Ricketts v. Logics, LLC, No. 5:15-CV-293-D, 2017 WL 4293406, at *8 (E.D.N.C. Sept. 27, 2017) (unpublished); Wood v. Town of Warsaw, 914 F. Supp. 2d 735, 744 (E.D.N.C. 2012); McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp 2d 595, 621 (E.D.N.C. 2006); North Carolina Dep't of Corr. v. Gibson, 308 N.C. 131, 141, 301 S.E.2d 78, 85 (1983). No rational jury could find that Swindell was terminated from his employment because of his race.[12] Accordingly, the court grants QSL's and L-3's motions for summary judgment on Swindell's wrongful discharge claim.

## IV.

In sum, the court GRANTS plaintiff's motion to amend his memorandum in opposition to defendants' motions for summary judgment [D.E. 86], and GRANTS L-3's and QSL's motions for summary judgment [D.E. 61, 68]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 30 day of September 2020.

JAMES C. DEVER III
United States District Judge

---

[12] Swindell does not assert a hostile work environment based on race in violation of North Carolina law. North Carolina does not recognize such a cause of action. See, e.g., McDonald v. Hanger Prosthetics & Orthotics, Inc., No. 7:14-CV-91-D, 2014 WL 4978505, at *1 (E.D.N.C. Oct. 6, 2014) (unpublished); Whitt, 359 N.C. at 625, 614 S.E.2d at 532.

39